IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Clipper Mill Federal, LLC,
Plaintiff,

v.  Civil No. – JFM-10-1647

The Cincinnati Insurance Company,
Defendant.

******

MEMORANDUM

Plaintiff Clipper Mill Federal, LLC, ("Clipper Mill" or "the Insured") brings this action against Defendant The Cincinnati Insurance Company ("Cincinnati" or "the Insurer") seeking a declaration that Cincinnati has a duty to defend and indemnify the Insured in a civil suit brought by Christie Polen-Bonitz ("Polen-Bonitz"), Laurie J. Novak ("Laurie Novak"), Joseph Dominic Novak, and Avalon Wellness, LLC (collectively, "the Avalon Plaintiffs") against Clipper Mill. Now pending before the court is Plaintiff Clipper Mill's motion for partial summary judgment and Defendant Cincinnati's cross-motion for partial summary judgment on the issue of the Insurer's duty to defend. The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. I largely agree with the arguments made by Cincinnati. However, because I find that the exception to the pollution exclusion requires Cincinnati to defend the bodily injury claims asserted by the Avalon Plaintiffs, Cincinnati has a duty to defend all claims. Therefore, Clipper Mill's motion for partial summary judgment will be granted, and Cincinnati's motion will be denied.

1

BACKGROUND

The underlying suit, which was filed in the Circuit Court for Baltimore City, arises out of Clipper Mill's lease of the first floor of the Pool and Hunt Building ("the Premises") located in the Clipper Mill redevelopment area to Avalon Wellness, LLC ("Avalon"). Pursuant to the lease agreement, dated November 23, 2005, Struever Bros., Eccles and Rouse, Inc. ("SBER") would design and construct a build-out of the Premises for use by Avalon and its members, including Polen-Bonitz and Laurie Novak, in their business activities. These activities were to include psychotherapy, counseling, and massage. (Pl's Mot. Partial Summ. J., Ex. 1 Complaint and Election of Jury Trial ("Avalon Compl."), at ¶¶ 9–15.)

According to the Avalon Plaintiffs' complaint, problems with the unit began immediately. From the beginning of the lease, it was apparent that the heating, ventilating, and air conditioning (HVAC) system was defective; specifically it was unable "to maintain balanced temperatures throughout the suite." Excessive sound transfer allowed people in the Premises to overhear conversations occurring in other rooms, which compromised the confidentiality of patients receiving therapy. The Avalon Plaintiffs allege that, despite promises to correct the problems, Clipper Mill's repair efforts failed. As a result, Avalon, although it had begun to occupy the Premises, refused delivery of the Premises under the lease. Even after Avalon, Clipper Mill, and SBER agreed upon a "punch list" of items necessitating repair, Clipper Mill and SBER delayed in making improvements, which ultimately prevented delivery of the Premises. (*Id.* at ¶¶ 18–24.)

In addition to the climate-control and sound-transfer problems, the Avalon Plaintiffs allege that Clipper Mill and SBER's wrongful conduct proximately caused "[t]oxic and dangerous airborne pollutants [to enter] the Premises," which "eventually made the space

2

uninhabitable for Avalon's purposes." Polen-Bonitz reports that she experienced adverse physical reactions to these pollutants. Laurie Novak became chronically ill and sustained permanent physical injuries as a result of her exposure. Due to the toxic pollutants and the ongoing HVAC and sound-transfer problems, the plaintiffs lost use of the Premises, and Avalon closed. (*Id.* at ¶¶ 25–28.)

On January 30 and March 19, 2008, counsel for the Avalon Plaintiffs sent demand letters to Clipper Mill and SBER seeking damages for their alleged injuries. (Pl's Mot. Partial Summ. J., Ex. 4 January 30, 2008 Settlement Demand Letter ("Demand Letter"); Ex. 5 March 19, 2008 Supplemental Settlement Demand Letter ("Supplemental Demand Letter").) Clipper Mill forwarded these letters to Cincinnati, but Cincinnati declined coverage. (Pl's Mot. Partial Summ. J., Ex. 6 April 15, 2008 Letter from the Cincinnati Insurance Companies.)

In their complaint, the Avalon Plaintiffs assert six counts against Clipper Mill: (i) breach of warranty of quiet and peaceful enjoyment; (ii) negligence; (iii) negligent misrepresentation; (iv) strict liability; (v) nuisance; and (vi) loss of consortium of Laurie and Joseph Novak. (Avalon Compl., at ¶¶ 29–55.) The negligence claim "aris[es] out of a contractual relationship," and is based on Clipper Mill's alleged failure to provide usable and safe premises. (*Id.* at ¶¶ 33–35.) The Avalon Plaintiffs allege Clipper Mill should be strictly liable for harms caused by the pollutants because Clipper Mill "controlled or had the right to control [tenants who] conducted abnormally dangerous activities which generated and released toxic fumes" that contaminated the Premises. (*Id.* at ¶¶ 45–46.) It is further alleged that these activities substantially and unreasonably interfered with use of the Premises, and therefore constituted a nuisance. (*Id.* at ¶ 51.)

During the relevant period, Clipper Mill was insured pursuant to two policies issued by Cincinnati, a commercial general liability policy (Policy No. CPP 0895325) ("the CGL Policy" or "the Policy") and an umbrella insurance policy (Policy No. CAP 5877135).[1]  Pursuant to these policies, Cincinnati has a duty to defend Clipper Mill against any suit seeking damages "because of 'bodily injury' or 'property damage' to which this insurance applies" or "because of 'personal and advertising injury' to which this insurance applies."  (Pl's Mot. Partial Summ. J., Ex. 2 Commercial General Liability Policy ("CGL Policy"), Form GA 1011204 §§ I(A)(1)(a), I(B)(1)(a).)  Clipper Mill now seeks a declaration that these provisions obligate Cincinnati to defend it in the underlying litigation.

## STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court of the United States explained that in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. 242, 249, 106 S. Ct. 2505 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party.  *Id.* at 255.

## ANALYSIS

---

[1] The parties agree the policies are identical in all relevant respects.  (Pl's Mot. Partial Summ. J., at 2 n.2.)  For convenience, the parties have limited their discussion to the commercial general liability policy, and I will refer to this policy only.

4

The parties agree upon the basic principles of Maryland law that that govern this dispute. Under Maryland law, "[t]he obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend." *Brohawn v. Transam. Ins. Co.*, 276 Md. 396, 347 A.2d 842, 850 (1975). The insurer's duty to defend arises whenever "there exists a '*potentiality* that the claim could be covered by the policy.'" *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 695 A.2d 566, 570 (1997) (quoting *Brohawn*, 347 A.2d at 850) (emphasis in original). "If there is a possibility, even a remote one, that the plaintiffs' claims could be covered by the policy, there is a duty to defend." *Id.* at 572; *see also Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 679 A.2d 540, 551 (1996) ("[A]ny doubt as to whether the allegations in the complaint state a potentially covered cause of action is ordinarily resolved in favor of the insured.").

Maryland courts have articulated a two-part inquiry to determine whether an insurer has a duty to defend. First, the court must determine "the coverage and . . . the defenses under the terms and requirements of the insurance policy." *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 438 A.2d 282, 285 (1981). This question "focuses upon the language and requirements of the policy." *Id.* "Maryland does not follow, as a matter of first resort, the view of construing an insurance policy most strongly against the insurer," but ambiguity as to the meaning of the language will be resolved against the party that drafted the contract, generally the insurer. *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 889 A.2d 387, 394 (2006) (citations omitted).

The court then must decide whether "the allegations in the tort action potentially bring the tort claim within the policy's coverage." *Pryseski*, 438 A.2d at 285. Although the focus of

this inquiry is the allegations in the underlying complaint, if these "are ambiguous as to whether there exists a potentiality of coverage . . . , the *insured* may rely on extrinsic evidence. The *insurer,* however, may not use such evidence to contest coverage if the allegations in the underlying tort suit sufficiently establish a potentiality of coverage." *Sheets*, 679 A.2d at 542 n.2 (citations omitted) (emphasis in original). If any claim is potentially covered under the policy, the insurer is obligated to defend all claims. *Utica Mut. Ins. Co. v. Miller*, 130 Md. App. 373, 746 A.2d 935, 940 (Ct. Spec. App. 2000); *see also Mut. Benefit Grp. v. Wise M. Bolt Co., Inc.*, 227 F. Supp. 2d 469, 475 (D. Md. 2002) ("If some of the claims against an insured fall within the terms of coverage and some without, the insurer must still defend the entire claim." (citation omitted)).

Clipper Mill claims three sources for Cincinnati's duty to defend: Property Damage Liability under Coverage A, Bodily Injury Liability under Coverage A, and Personal and Advertising Injury Liability under Coverage B.

I. <u>Property Damage Claims</u>

Coverage A of the CGL Policy sets out the Insurer's obligations as to liability for both "property damage" and "bodily injury." It provides in relevant part:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> . . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:

6

> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" . . . .

(CGL Policy, Form GA 1011204 §§ I(A)(1)(a)–(b).) "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these . . . ." (*Id.* at § V(4).) "Property damage" includes both "[p]hysical injury to tangible property, including all resulting use of that property" and "[l]oss of use of tangible property that is not physically injured." (*Id.* at § V(20).) "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at § V(16).) Under a "Pollution Exclusion," the CGL Policy excludes from coverage "'[b]odily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of 'pollutants' . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured." (*Id.* at § I(A)(2)(f)(1).)

### A. *"Caused by an 'Occurrence'"*

Cincinnati contends that the Avalon Plaintiffs' alleged property damage was not caused by an "occurrence" because the damages are the result of Clipper Mill's failure to fulfill its contractual obligations under the Lease, which does not constitute an "accident."

The Maryland Court of Appeals has determined that an act of negligence constitutes an "accident" within the meaning of a liability insurance policy "when the resulting damage was 'an event that takes place without [the insured's] foresight or expectation." *Sheets*, 679 A.2d at 548 (quoting *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.*, 248 Md. 148, 235 A.2d 556, 559 (1967)) (alteration in original). When applying this rule in the context of this case, however, it is essential to recognize that the Insurer has "'issued a general liability policy, not a performance

bond.'" *Lerner Corp. v. Assurance Co. of Am.*, 120 Md. App. 525, 707 A.2d 906, 912 (Ct. Spec. App. 1998) (quoting *Reliance Ins. Co. v. Mogavero*, 640 F. Supp. 84, 85 (D. Md. 1986)); *see also id.* ("[P]oor performance by an insured is a cost of doing business, not a component of the insurance objective of shifting risk." (citation omitted)). An insured who is party to a contract, therefore, cannot claim it was unexpected and unforeseen that when the product delivered fails to "meet the contract requirements of the sale, the purchaser will be entitled to correction of the defect." *Id.*

In order to determine whether property damage is the result of an "occurrence" where there is potential contractual liability, the focus of the inquiry is on the nature of the damages: "If the damages suffered relate to the satisfaction of the contractual bargain, it follows that they are not unforeseen." *Id.* Specifically, the "[c]ourts uniformly hold that when property damage arising out of the insured's defective workmanship is confined to the insured's own work product, the damage is not caused by an 'occurrence.'" *Woodfin Equities Corp. v. Harford Mut. Ins. Co.*, 110 Md. App. 616, 678 A.2d 116, 131 (Ct. Spec. App. 1996), *overruled in part on procedural grounds by* 344 Md. 399, 687 A.2d 652 (1997). Where other property incurs damage, however, this constitutes an "occurrence," which may be compensable under the CGL Policy. *Id.* at 133. Accordingly, "the critical inquiry in determining whether alleged damages were 'expected' by the insured is whether the damages relate to the satisfaction of the insured's contractual obligations to construct its product or whether the damages relate to something other than the insured's product." *Wise M. Bolt Co.*, 227 F. Supp. 2d at 475–76.

The Avalon Plaintiffs have alleged property damage in the form of loss of use of the Premises. They allege three causes of this damage: (1) a defective HVAC system; (2) excessive sound transfer; and (3) the infiltration of airborne pollutants. I conclude, below, that property

8

damage caused by airborne pollutants falls within the Pollution Exclusion, so I will limit my discussion to whether the first two problems potentially constitute "occurrences" under the CGL Policy.[2] Because the Avalon Plaintiffs' damages involve only the loss of use of the property that the Insured was contractually obligated to provide, I find that they do not.

The HVAC and sound-transfer problems are not "occurrences" or "accidents" because they involve defective workmanship that harmed only the Insured's own work product. According to the Avalon Plaintiffs' complaint, Clipper Mill and SBER contracted to provide a space suitable for their business activities, but they failed to provide the climate control capabilities and soundproofing required by the contract. Clipper Mill contractual duty with respect to the HVAC system is express; in the contract it agrees to provide central heating and air conditioning services. (Pl.'s Reply Def.'s Opp. Mot. Partial Summ. J. ("Pl.'s Reply"), Ex. 13 Office Lease ("Lease"), at 19.) The lease does not explicitly refer to soundproofing, but the Avalon Complaint specifies that its negligence claim arose "out of a contractual relationship" with Clipper Mill (Avalon Compl., at ¶ 33) and alleges that Clipper Mill was aware, in entering the lease, that the space must meet their special needs with respect to confidentiality in order to fulfill the covenant of quiet enjoyment. (*Id.* at ¶¶ 16–19; *see also* Lease, at Ex. B (providing drawing of proposed layout that includes "therapy" rooms).) Under Maryland law, these problems of defective workmanship constitute "occurrences" only if they harm property other than the Insured's own work product. Here, the Avalon Plaintiffs alleged only loss of use of the Premises, which was the area Clipper Mill contracted to provide. Because the Premises were Clipper Mill's work product, the harm was not caused by an occurrence.

---

[2] Although I do not reach the issue, it seems likely that the property damage caused by the pollutants potentially could be the result of an "occurrence." Unlike the HVAC and sound-transfer problems, this did not involve defective workmanship, so, under *Sheets*, the proper inquiry is whether the damage was foreseen or expected. It seems likely that there is at least a possibility that Clipper Mill, in performing or allowing the unspecified activities that created the pollutants, did not foresee that they would make the Premises uninhabitable.

9

Clipper Mill claims that because the Avalon Plaintiffs have alleged loss of use of the property, the court must find an "occurrence" under *Woodfin Equities Corp. v. Harford Mutual Insurance Co.*, 678 A.2d 116. This reliance on *Woodfin Equities* is misplaced. In that case, which was overruled in part on procedural grounds, the Maryland Court of Special Appeals found that the insurer of a subcontractor that defectively installed an HVAC system in a hotel was not obligated to provide liability coverage for property damage to the HVAC system and related economic costs because this constituted damage to the insured's work product. *Woodfin Equities*, 678 A.2d at 131–32. Loss of the use of the hotel's guest rooms as a result of the defective HVAC system, however, was caused by an "occurrence," and therefore was compensable under the policy. *Id.* at 133. Clipper Mill interprets this case to require coverage whenever loss of use is alleged. (Pl.'s Reply at 13.) However, the determinative factor in *Woodfin Equities* was not that there was loss of use of property, but rather that there was loss of use of property *other than* the insured's work product. *See Woodfin Equities*, 678 A.2d at 133 ("Unlike the HVAC systems, the guest rooms are not the work product of the insured . . . ."). Here, in contrast, the Avalon Plaintiffs allege that they were unable to use the Premises, which was precisely the property Clipper Mill contracted to provide. Where, as alleged by the Avalon Plaintiffs, a landlord fails to deliver a rental property as required by the lease and does not make the repairs necessary to bring the property into compliance with the lease, the landlord cannot claim it is unexpected or unforeseen that the tenant is unable to use that property.

Clipper Mill also argues that the decision of the Maryland Court of Appeals in *Sheets* requires the court to find that property damage was caused by an "occurrence" where the plaintiff in the underlying suit alleges negligent misrepresentation. In *Sheets*, however, the court stated that negligent misrepresentation should be treated like other forms of negligence. 679

A.2d at 551. That is, an insurer is obligated to defend a claim of negligent misrepresentation only if there is a potentiality that "the resulting damage is 'an event that takes place without one's foresight or expectation.'" *Id.* (quoting *Harleysville*, 235 A.2d at 559). *Lerner Corp. v. Assurance Co. of America* is instructive on this point. In that case, developers of a building sued their insurer to recover the costs to repair the building's defective stone façade. 707 A.2d at 907–08. Although the insureds had faced only a breach of contract claim, the Maryland Court of Special Appeals stated that, had there been a negligent misrepresentation claim, it would nonetheless have found that the insurer was not liable. *Id.* at 911. Summary judgment for the insurer would have been appropriate because the court did "not believe that [the insureds'] liability to repair the Building's facade resulted from an 'accident' but simply from its failure to satisfy its obligation under their contract." *Id.*; *see also Am. Modern Home Ins. Co. v. Reeds at Bayview Mobile Home Park, LLC*, 176 F. App'x 363, 366 (4th Cir. 2006) (unpublished) (affirming the district court's finding that an insurer was not obligated to defend an insured against a negligent misrepresentation claim, despite *Sheets*, because "it is not conceivable that the parks' alleged conduct 'may have taken place without [the parks'] foresight or expectation' of the damage caused" (quoting *Sheets*, 679 A.2d at 551) (alteration in original)). As I have concluded that the property damage resulting from Clipper Mill's alleged misstatements regarding its ability to provide a suitable space for Avalon's business activities could not have been unexpected or unforeseen because it arose simply from Clipper Mill's alleged failure to fulfill its contractual obligations, I find that this damage was not caused by an "occurrence."

    B. *Pollution Exclusion*

Cincinnati also argues that the CGL Policy's Pollution Exclusion bars coverage for any property damage caused by the alleged "airborne pollutants." Clipper Mill contends the

11

Pollution Exclusion only applies to environmental pollution, so it does not foreclose the potentiality of coverage here.

>   The CGL Policy provides the following definition of "Pollutant":
>
>> "Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the "pollutants" . . . .

(CGL Policy, Form GA 1011204 § V(18).) In *Clendenin Bros.*, the Maryland Court of Appeals, in light of "the historical development of the pollution exclusion clause" and the analysis of other courts, concluded that a pollution exclusion in a commercial general liability policy did "not apply beyond traditional environmental pollution situations." *Clendenin Bros.*, 889 A.2d at 398; *see also Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617, 622–23 (1995) ("The history of the pollution exclusion supports" the conclusion "that the insurance industry intended the pollution exclusion to apply only to environmental pollution."). The Court of Appeals noted, "[D]ischarge, dispersal, release, escape, contaminant, and pollutant are terms of art in environmental law and are used by Maryland courts to refer to environmental exposure." *Clendenin Bros.*, 889 A.2d at 398 (internal quotation marks and citation omitted). Clipper Mill asserts that *Clendenin Bros.* requires the court to find that the exclusion in the CGL Policy also applies only to environmental pollutants.

In Maryland, an insurance policy is a contract and is to be read as any other contract. *Little v. First Federated Life Ins. Co.*, 267 Md. 1, 296 A.2d 372 (1972). The words of an insurance policy are to be given their ordinary meaning. *C & H Plumbing & Heating, Inc. v.*

12

*Employers Mut. Cas. Co.*, 264 Md. 510, 287 A.2d 238 (1972). Thus, although the Maryland courts previously determined the meaning of a pollution exclusion, the parties to subsequent insurance contracts remain free to change the scope of this exclusion by altering the language of the contract.

The policy in the present case contains an important distinction from that involved in *Clendenin Bros.* The CGL Policy tracks the definition of "Pollutant" contained in the policy at issue in *Clendenin Bros.*, but adds, "'Pollutants' include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to *persons, property or the environment*. . . ." *Compare Clendenin Bros.*, 889 A.2d at 390, *with* CGL Policy, Form GA 1011204 § V(18) (emphasis added). The addition of this sentence expanded the definition of Pollutant beyond environmental pollutants. The CGL Policy's use of the phrase "harmful or toxic to persons, property or the environment" shows that the definition includes irritants and contaminants that harm persons but not the environment. *Cf. Cincinnati Ins. Co. v. Becker Warehouse, Inc.*, 262 Neb. 746, 635 N.W.2d 112 (2001) (holding, under Nebraska law, that an identical pollution exclusion unambiguously excluded coverage for damages caused by all pollutants, not merely traditional environmental pollution). As the Nebraska Supreme Court noted in interpreting an identical exclusion, "[b]y including 'the environment' as a separate entity that could suffer harm from a pollutant, the pollution exclusion does not limit its scope of application to environmental pollution." *Id.* at 120. Damage caused by the "airborne pollutants" described in the Avalon Complaint, therefore, falls within the CGL Policy's Pollution Exclusion. The complaint describes these as "airborne contaminants" that were "toxic" to persons; specifically, the pollutants allegedly harmed Polen-Bonitz and Laurie Novak.[3] (Avalon Compl.,

---

[3] The expansive nature of this Pollution Exclusion does present the problem identified in *Clendenin Bros.* that a pollution exclusion not limited to traditional environmental pollution, if read broadly, may cover virtually any

at ¶¶ 25–28.) The Avalon Plaintiffs' claims for property damage resulting from pollutants on the Premises are excluded from coverage under the Pollution Exclusion.

II. <u>Bodily Injury Claims</u>

Cincinnati acknowledges that the Avalon Plaintiffs' bodily injury would, if proven, be caused by an "occurrence" because the pollutants allegedly caused damage to something other than the Insured's work product. Cincinnati argues, however, that the bodily injury claims fall within the Pollution Exclusion, so there is no potentiality of coverage. For the reasons stated above with respect to the property damage claims, I find that the Pollution Exclusion applies to these claims. Accordingly, the claims will be excluded from coverage unless an exception to the Exclusion applies.

The CGL Policy contains the following bodily-injury exception to the Pollution Exclusion:

> [The Pollution Exclusion in] Paragraph (a) does not apply to:
>
> 1) "Bodily injury" to any person injured while on any premises, site or location owned or occupied by, or rented or loaned to, you provided:
>    a) The injury is caused by the inadequate ventilation of vapors;
>    b) The person injured is first exposed to such vapors during the policy period; and
>    c) [Changed by Endorsement to require treatment or diagnoses by a physician for a condition caused by the exposure within one year.]

---

substance or item that causes harm to an individual. *See Clendenin Bros.*, 889 A.2d at 396 (describing how a person who slips and falls on spilled Drano might conceivably consider it an irritant (citation omitted)). At this time, I need not address the particular contours of this Exclusion because the allegations in the Avalon Complaint clearly fall within the CGL Policy's definition of "Pollutant." The Avalon Complaint, in fact, describes the contaminants as "pollutants," and its description of the pollutants as "toxic and dangerous airborne contaminants" and "airborne chemicals and particulates" that cause "illnesses and adverse [chemical] reactions" comports with a commonsense understanding of what constitutes a pollutant.

14

(CGL Policy, Form GA 1011204 § I(A)(2)(f)(1); CGL Policy, Form GA 4781001 § 2.) The Policy defines "vapors" in this context to mean "any gaseous or airborne irritant or airborne contaminant, including smoke, fumes, vapor or soot, but excluding asbestos, which is discharged, dispersed, emitted, released or escapes from materials, machinery or equipment used in the service or maintenance of the premises." (*Id.* at Form GA 1011204 § I(A)(2)(f)(1)(a).) It specifically excludes from the definition of "vapors" "any gaseous or airborne irritants or contaminants used in a manufacturing process or which is the product or by-product of any manufacturing process." (*Id.*)

It is undisputed that the allegations in the Avalon Complaint establish the requirements of subsections b) and c) of the bodily-injury exception. Cincinnati contends this exception cannot apply, however, because the Avalon Complaint contains no allegation of inadequately ventilated vapors. The proper inquiry, however, is not whether the complaint clearly establishes that the claim is covered but rather whether the complaint forecloses the potentiality of coverage for the claims alleged. In the present case, the Avalon Complaint does not specify the source or nature of the pollutants; it states only that unidentified "[t]oxic and dangerous airborne pollutants entered the Premises." (Avalon Compl., at ¶ 25.) Although the strict liability claim states that Clipper Mill controlled the activity of "tenants [who] . . . conducted abnormally dangerous activities which generated and released toxic fumes," it does not specify the nature of these activities or foreclose the possibility of additional sources of the pollutants. (*Id.* at ¶ 45.) In light of the allegations of problems involving the Premises' HVAC system, it remains possible that inadequate ventilation may be involved. As the allegations in the Avalon Complaint do not permit me to rule out the possibility that the bodily-injury exception applies, a potentiality of

15

coverage remains.[4] *Cf. Indus. Enters., Inc. v. Penn Am. Ins. Co.*, Civil Action No. RDB-07-2239, 2008 WL 4120221, at *5 (D. Md. Sept. 2, 2008) ("The vague allegations do not mention any specific polluting activities or any possible causes . . . . This Court is unable to . . . rule out the possibility that [the demand letter] is based, at least in part, on a sudden and accidental occurrence. Therefore, . . . there remains a potentiality of coverage.").

Extrinsic evidence—which Clipper Mill may rely upon to establish coverage, but Cincinnati may not use to contest coverage—provides further support for my conclusion that there is a potentiality of coverage. An environmental investigator hired by Clipper Mill to study the air quality problems on the Premises determined two possible sources of pollution for which Clipper Mill might be held responsible.[5] The first, fumes from paint booth stacks being used by another tenant, could not trigger the exception because these were not produced by machinery or materials used in maintaining or servicing the premises. Indeed, they appear to be the by-product of a manufacturing process. (Pl's Mot. Partial Summ. J., Ex. 11 Peter R. Steinmetz Environmental Investigation Report Case #1787 ("Environmental Report"), at 2–3.) The second potential source, however, was an "open fire pit" that did not "have a chimney high enough to dissipate the wood smoke." (*Id.* at 3.) A November 21, 2007 letter from counsel for the Avalon Plaintiffs reports that the fire pit was used to "burn[] trash and construction debris." (Pl's Mot. Partial Summ. J., Ex. 10 November 19, 2007 W. Randolph Shump Letter.) The Avalon

---

[4] Cincinnati argues that finding a potentiality of coverage without an allegation in the complaint of inadequate ventilation violates the rule set out in *Reames v. State Farm Fire & Casualty Insurance*, 111 Md. App. 546, 683 A.2d 179 (Ct. Spec. App. 1996), that "[u]nasserted causes of action that could potentially have been supported by the factual allegations or the extrinsic evidence cannot form the basis of a duty to defend." *Id.* at 186. In *Reames*, however, the court found there was no potentiality of coverage because the plaintiff in the underlying litigation did not bring a claim for bodily injury, even though the factual allegations may have supported such a claim, which would have been covered. *See id.* Here, a potentially covered cause of action for bodily injury has been asserted. The complaint merely does not provide all of the factual details supporting the claim. Accordingly, I am not relying on a "new, unasserted claim" in finding a potentiality of coverage. *Id.*

[5] The investigator also reported that some of the indoor air pollution was likely caused by occupancy use issues, specifically the use of massage oils and therapy fragrances in Avalon's business activities. (Pl's Mot. Partial Summ. J., Ex. 11 Peter R. Steinmetz Environmental Investigation Report Case #1787 ("Environmental Report"), at 4.)

16

Plaintiffs' Supplemental Settlement Demand asserts that "the HVAC system . . . was drawing in fumes from the . . . fire pit and disbursing the fumes throughout the Premises." (Supplemental Demand Letter, at 2.) The environmental investigator's report further stated that the "attic ventilation system" may have allowed contaminated air to enter the Premises. (Environmental Report, at 3.) This evidence demonstrates that the underlying litigation may ultimately establish that smoke, produced by a fire pit used to service Clipper Mill's property, entered into and remained on the Premises as a result of inadequate ventilation, causing bodily injury.[6] If so, this claim would fall within the exception to the Pollution Exclusion.

I find that the Avalon Plaintiffs' bodily injury claims are potentially covered under the CGL Policy, so Cincinnati has a duty to defend all claims. Therefore, I need not reach the issue of whether the property damage claims are potentially covered as Personal and Advertising Liability.[7]

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for partial summary judgment will be granted and the defendant's motion will be denied. A separate Order follows.

October 20, 2010      /s/
Date      J. Frederick Motz
     United States District Judge

---

[6] Because I find that this exception applies, I need not consider the applicability of the "Sudden and Accidental Exception." (CGL Policy, Form GA 4781001 § 1.) If I were to reach this issue, I would likely find that this exception does not apply because a release of pollutants cannot be "sudden" if it "results from a series of ongoing events which constitute a course of conduct or course of business." (*Id.* at § 6.4.) Both the allegations of the complaint and all extrinsic evidence show that any releases here were the result of such a series of ongoing events.

[7] Were I to reach this issue, I would likely find that there is no potentiality of coverage because the claims fall within the exclusions for breach of contract, contractual liability, or pollutants. (CGL Policy, Form GA 1011204 §§ I(B)(2)(e), (f), (n).) There are no exceptions to the Pollution Exclusion to coverage for Personal and Advertising Liability. (*Id.* at § I(B)(2)(n).)